IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BRENDA H. ALMS,            ) | |
|     Plaintiff,            ) | |
|                                                               ) | |
| v.            ) | CIVIL ACTION NO. 10-00646-KD-M |
|            ) | |
| LEXIS NEXIS OCCUPATIONAL            ) | |
| HEALTH SOLUTIONS INC., and            ) | |
| WINN-DIXIE MONTGOMERY, LLC,            ) | |
|     Defendants.            ) | |

**ORDER**

This matter is before the Court on the motions for summary judgment filed by Defendant Winn-Dixie Montgomery, LLC ("Winn-Dixie") (Doc. 61) and Defendant Lexis Nexis Occupational Health Solutions Inc. ("Lexis Nexis") (Doc. 64). Upon consideration of the parties' briefs and evidentiary submissions (Docs. 62, 63-1 to 63-7, 65, 65-1 to 65-19, 67, 67-1 to 67-2, 68, and 69), Defendants' motions are due to be **GRANTED**.

**I.  Procedural History**

On October 25, 2010, Plaintiff Brenda H. Alms ("Alms"), an Alabama resident, commenced this action by filing an unsigned, four-count complaint in the Circuit Court of Baldwin County, Alabama that alleged certain causes of action against Defendant Lexis Nexis (a Tennessee corporation), Defendant Winn-Dixie (a Florida limited liability company), and former Defendant Laboratory Corporation of America Holdings ("LabCorp") (a Delaware corporation). (Doc. 1-1 at 11-18; Doc. 1 at 2-3; Doc. 14 at 2-3). Alms also pled a cause of action for defamation against a fourth defendant identified in the case caption as "'Charlene,' whose name is otherwise unknown." (Doc. 1-1 at 15-16, ¶¶ 23-27). "Charlene" was alleged to be a resident of Baldwin County,

1

Alabama, who, at all times relevant to Alms' claims, was employed by Winn-Dixie.  (Id. at 12, ¶ 4).[1]

On November 15, 2010, Alms filed a signed, three-count complaint against LabCorp, Lexis Nexis, Winn-Dixie, and "Charlene."  (Doc. 14-6 at 2-6).  Two weeks later, on November 29, 2010, Lexis Nexis, Winn-Dixie, and LabCorp removed Alms' case to federal court on the basis of diversity jurisdiction.  (Doc. 1).  On May 26, 2011, Alms' claims against LabCorp were dismissed with prejudice.  (Docs. 37 & 38).  On December 16, 2011, the Court determined that "Charlene" had been fraudulently joined, whereas Alms' complaint failed to state a viable claim against her.  Alms v. Lexis Nexis Med. Review Servs., No. 10-00646-KD-M, 2011 WL 6304946 (S.D. Ala. Dec. 16, 2011).[2]

What presently remains of Alms' case is a cause of action for negligence and wantonness alleged against Lexis Nexis ("Count I"), a cause of action for defamation alleged against Lexis Nexis ("Count II"), and a cause of action for defamation alleged against Winn-Dixie ("Count III").  Lexis Nexis and Winn-Dixie have separately moved for summary judgment as to the respective claim(s) against them.  (Docs. 61 & 64).  Whereas Alms' response (Doc. 67) and Defendants' replies (Docs. 68 & 69) have been timely filed, the motions are now ripe for consideration.

## II.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56(c) governs procedures and provides as follows:

---

[1]  Discovery revealed that "Charlene" is Charlene Outlaw, a Grocery Associate at the Winn-Dixie store in Robertsdale, Alabama.  (Doc. 63-6 at 2).

[2]  Because "Charlene" was fraudulent joined, it is **ORDERED** that she be and hereby is **DISMISSED** as a defendant in this action.  See Florence v. Crescent Res., LLC, 484 F.3d 1293, 1297 (11th Cir. 2007).

> **(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2)** *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3)** *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> **(4)** *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Defendants, as the parties seeking summary judgment, bear the initial responsibility of informing the district court of the bases for their motions and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).

If the non-moving party fails to make a sufficient showing on an essential element of her

case with respect to which she has the burden of proof, the moving parties are entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether the non-moving party has met her burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

### III. Factual Background

From sometime in December 2001 until her termination in March 2010, Alms was employed at Winn-Dixie Store 570 in Foley, Alabama. (Doc. 63-1 at 5). On February 11, 2010, approximately 30 minutes after reporting for work, Alms tripped over a pallet jack and sustained an injury for which she was treated at South Baldwin Regional Medical Center ("South Baldwin"), a hospital in Foley. (Doc. 67-2 at 1; Doc. 65-3 at 3). While at South Baldwin, Alms received at least one intravenous dose of Dilaudid, a brand of hydromorphone hydrochloride, an opioid painkiller. (Doc. 65-2 at 10-12; Doc. 65-5 at 8-9; Doc. 65-19 at 2).

Winn-Dixie instructed Alms to provide a urine sample for post-accident drug testing after receiving treatment at South Baldwin. (Doc. 65-2 at 12-13; Doc. 65-5 at 2; Doc. 67-2 at 2). LabCorp's Southaven, Mississippi laboratory received Alms' sample on February 12, 2010. (Doc. 65-5 at 3; Doc. 67-2 at 2). LabCorp initially performed a five-panel immunoassay to screen for the presence of amphetamines, cocaine, marijuana metabolites, opiates, and phencyclidine (PCP). (Doc. 65-5 at 20; Doc. 65-15 at 5-6 & 12; Doc. 67-2 at 2-3). Immunoassay is an "extremely sensitive" test that LabCorp uses for the qualitative purpose of identifying "presumptive positives." (Doc. 65-4 at 13; Doc. 65-15 at 12). If a sample is identified as a presumptive positive, LabCorp will specially prepare the sample for a confirmation test performed

4

by gas chromatography/mass spectrometry ("GC/MS").  (Doc. 65-4 at 13; Doc. 65-15 at 13).  GC/MS is a "tandem technology" that identifies substances on a molecular level.  (Doc. 65-15 at 6 & 13).  In the drug testing industry, GC/MS is considered the "gold standard" test because of its accuracy, precision, and ability to distinguish between compounds with similar molecular structures.  (Doc. 65-10 at 10).  The immunoassay performed on Alms' sample detected the likely presence of opiates.  (Doc. 65-4 at 14-16; Doc. 65-5 at 20).  LabCorp's GC/MS test confirmed that Alms' sample contained codeine, an opiate, at a concentration of 2,209 ng/mL.  (Doc. 67-2 at 2).

On February 13, 2010, LabCorp reported the result of Alms' drug test to Lexis Nexis, the successor to ChoicePoint WorkPlace Solutions, Inc., a company that Winn-Dixie engaged in November 2008 to review and verify the results of occupational drug tests.  (Doc. 65-4 at 5-6 & 11-12; Doc. 65-5 at 1, 4 & 25-30; Doc. 65-9 at 1-2).  Lexis Nexis verifies test results by submitting those results to a Medical Review Officer ("MRO").  An MRO is a licensed physician who possesses clinical experience and whose knowledge includes but is not limited to the areas of pharmacology, toxicology, controlled substance abuse disorders, and medical explanations for positive laboratory drug test results.  (Doc. 65-9 at 1-2; Doc. 65-14 at 3; Doc. 67-2 at 11).  When presented with a positive test result, Lexis Nexis' MROs will interview the specimen donor in an effort to determine whether a legitimate medical explanation for the positive result exists.  (Doc. 65-9 at 1-2; Doc. 65-14 at 3-4).  Specimen donors are responsible for providing Lexis Nexis' MROs with proof, such as a valid prescription or other supporting documentation, of any proffered explanation.  (Doc. 65-9 at 2).  If an MRO determines that a legitimate medical explanation exists, the MRO will overturn the result reported by the laboratory and will report a negative result to the specimen donor's employer.  (Id.).  As expressed by Lexis Nexis, an MRO is "an

independent and impartial 'gatekeeper'" who will "convert" a laboratory positive report into a negative report, "if a positive drug test is the result of the donor using legally prescribed medications."  (Doc. 67-2 at 4).  However, in the context of occupational drug tests performed at the behest of private, non-regulated employers[3] (e.g., Winn-Dixie), if a drug test indicates the presence of codeine at a concentration greater than 2,000 ng/mL, and if the specimen donor fails to provide a legitimate medical explanation therefor, Lexis Nexis will report the test as positive.  (Doc. 65-9 at 3).[4]

---

[3]  The U.S. Department of Transportation ("DOT") has promulgated regulations at 49 C.F.R., Part 40 ("Part 40") that prescribe procedures and requirements with respect to drug and alcohol testing of aviation employees, commercial motor vehicle drivers, transit employees, and railroad employees.  (Doc. 65-9 at 2).  Employers whose employees are not subject to the provisions of Part 40 may elect to adhere to DOT's protocols, but many do not.  (Id.).

[4]  Lexis Nexis' opiate policy sets forth that, in the non-regulated context, a specimen that contains a concentration of codeine less than 2,000 ng/mL will be reported as negative without the need for the donor to offer any explanation.  (Doc. 67-2 at 34).  However, the test will be reported as positive if 1) the codeine concentration is greater than 2,000 ng/mL but less than 7,000 ng/mL; and 2) the donor does not profess to have ingested poppy seeds (which naturally contain codeine, see id. at 32) and/or a legally prescribed medication that would explain the presence of codeine in his or her urine:

| Summary of MRO Responses to Lab Opiate Reports | | |
|---|---|---|
| | Regulated | Non-Regulated |
| 0,000-1,999 ng/mL | Negative | Negative |
| 2,000-5,000 ng/mL Codeine RX or OTC Codeine present to L.O.D. | Negative | Negative |
| 2,000-6,999 ng/mL With poppy-seeds or RX | Negative | Negative |
| **2,000-6,999 ng/mL Without poppy-seeds or RX** | Opiate Physical | **Positive** |

(Id. (emphasis added)).

In an endeavor to create a disputed issue of fact, Alms has failed to address the information summarized above.  Instead, she has directed the Court to a portion of Lexis Nexis' opiate policy that addresses the procedural burden of proof that an MRO is instructed, under Lexis Nexis' internal operating procedures, to follow in determining the results of a test.  (Doc. 67 at 7 & 14).  However, as explained in footnote 7, infra, this issue is not before the Court.

On February 15, 2010, a Lexis Nexis MRO contacted Alms to discuss the fact that LabCorp detected codeine in her urine specimen. (Doc. 65-2 at 15-16 & 18; Doc. 67-2 at 43). The MRO asked Alms whether she "had taken anything that would cause an issue with [the] drug screen." (Doc. 65-2 at 15-16). Alms reported to the MRO that, after she fell at Winn-Dixie on February 11, 2010, she had been given "something" at the hospital and also that she had taken some prescription cough medicine on February 9, 2010, two days prior to her fall. (Id. at 15-17). On February 16, 2010, Alms faxed Lexis Nexis several pictures of a bottle of Tussionex, a cough suppressant that contains hydrocodone (a semi-synthetic opioid) and chlorpheniramine (an antihistamine), which she claimed to have taken on February 9. (Doc. 65-2 at 19; Doc. 65-5 at 6-7; Doc. 65-10 at 5; Doc. 65-15 at 21-22; Doc. 65-17 at 2; Doc. 65-18 at 2-3; Doc. 67-2 at 43-44). Additionally, on February 17, 2010, Alms faxed Lexis Nexis a copy of her medical chart from South Baldwin, which indicated that she had been administered Dilaudid a few hours before providing a urine sample for drug testing. (Doc. 65-2 at 20-21; Doc. 65-5 at 8-9; Doc. 65-17 at 2; Doc. 67-2 at 44). Alms did not disclose to Lexis Nexis any other legitimate or illegitimate drug use, and it is her taking of Tussionex on February 9, 2010 and South Baldwin's administration of Dilaudid on February 11, 2010 that, according to Alms, provide a legitimate medical explanation for the test results reported by LabCorp. (Doc. 65-2 at 24-26; Doc. 65-16 at 2; Doc. 65-17 at 2).

On February 18, 2010, Dr. Abraham Hammell ("Hammell"), a Lexis Nexis MRO, verified Alms' drug test as positive for opiates. (Doc. 65-9 at 4-5). After reviewing the test results reported by LabCorp, pictures of the Tussionex bottle that Alms had faxed to Lexis Nexis, and the medical records from South Baldwin that indicated Alms had been administered Dilaudid, Hammell concluded that there was no legitimate medical explanation for the presence for codeine in Alms' urine. (Id. at 2-5). Accordingly, Lexis Nexis forwarded a Controlled Substance Test

Report to Winn-Dixie that indicated that Alms' urine was positive for opiates.   (Id. at 5; Doc. 67-2 at 3 & 43).

Hammell's conclusion was based in part on the facts that 1) neither Tussionex nor Dilaudid contains codeine; and 2) codeine is molecularly distinct from both hydrocodone (the opioid contained in Tussionex) and hydromorphone (the opioid in Dilaudid).  (Doc. 65-9 at 4; Doc. 65-10 at 5-7).   Whereas a codeine molecule contains single-bonded oxygen and hydrogen atoms at carbon #6, a hydrocodone molecule contains a double-bonded oxygen atom at that location; whereas both hydrocodone and codeine molecules have a methoxy group (O-CH3 group) at carbon #3, a hydromorphone molecule has a phenolic group (H-O group) at that location:

**Hydrocodone**     **Codeine**     **Hydromorphone**

(Doc. 65-10 at 5-7).     Hammell also considered that the GC/MS technology used by LabCorp to confirm Alms' presumptively positive drug test is sufficiently precise to distinguish between codeine, hydrocodone, and hydromorphone and would not have mistaken the presence of one such substance for the presence of another.  (Doc. 65-9 at 4; Doc. 65-10 at 10; Doc. 65-14 at 5). Finally, Hammell considered the well-documented facts that 1) the human body does not metabolize either hydrocodone or hydromorphone into codeine once ingested; and 2) humans do not excrete codeine in urine following ingestion of either hydrocodone or hydromorphone.  (Doc. 65-9 at 4; Doc. 65-10 at 8; Doc. 65-14 at 5).[5]

---

[5]   At her deposition, Alms claimed that a Winn-Dixie pharmacist whose name she could not recall told her that Tussionex is made from codeine.  (Doc. 67 at 19-20; Doc. 65-2 at 19-20; Doc.

8

On March 5, 2010, at the direction of Winn-Dixie's human resources department, the manager of the Winn-Dixie store in Foley terminated Alms for failing her post-accident drug test. (Doc. 63-1 at 7; Doc. 63-4 at 4; Doc. 65-3 at 1). One week after Alms' termination, Winn-Dixie's human resources department asked Lexis Nexis' Chief MRO, Dr. Stuart Hoffman ("Hoffman"), to re-examine Alms' drug test results and to give particular consideration to the fact that Alms "was given the medication Dilaudid prior to taking her post accident drug test." (Doc. 67-1 at 18 & 33-34; Doc. 67-2 at 42). Winn-Dixie asked Hoffman to "please have [Alms'] drug test result changed from a positive to a negative a.s.a.p.," if he thought such a change was possible. (Doc. 67-1 at 33-34; Doc. 67-2 at 42). On March 26, 2010, Hoffman responded that it was not possible to change Alms' result because the administration of Dilaudid could not explain the presence of codeine in Alms' urine. (Doc. 67-1 at 34; Doc. 67-2 at 43-44).

As grounds for her defamation claim against Winn-Dixie, Alms alleges that, sometime after she was terminated, Brian Begue ("Begue"), a merchandiser who delivered magazines and other publications to Winn-Dixie stores in South Alabama in early 2010, had a conversation with Charlene Outlaw ("Outlaw"), an employee of the Winn-Dixie store in Robertsdale, Alabama, during which Outlaw stated that Alms "had been found with codeine in her system and had been

---

67-2 at 18). Lexis Nexis has properly objected that this alleged statement is inadmissible hearsay (Doc. 68 at 6 n.4), which the court may not consider on summary judgment. See Fed. R. Civ. P. 56(c)(2). In any event, Lexis Nexis does not dispute that hydrocodone, the semi-synthetic opioid contained in Tussionex, may be derived from codeine, as the Winn-Dixie pharmacist allegedly said. (Doc. 68 at 6 n.4; Doc. 65-10 at 5). However, this undisputed fact does not explain Alms' drug test results (and therefore is not material) given that, as set forth above, hydrocodone — whether derived from codeine or any other opioid — is not biotransformed into codeine by the human body.

Similarly, the stated belief of a Winn-Dixie human resources employee that South Baldwin's administration of Dilaudid could explain Alms' test results, see Doc. 67-2 at 41, fails to create a material issue of fact, whereas Alms has failed to lay any foundation to suggest that person is qualified to offer such an opinion.

9

fired."  (Doc. 14-16 at 6; Doc. 63-1 at 13; Doc. 63-5 at 2-3; Doc. 63-6 at 2).   Though Begue and Outlaw admit that they spoke about Alms' termination, Begue claims that Outlaw did not tell him why Winn-Dixie had let Alms go.   (Doc. 63-5 at 3).   Similarly, Outlaw denies revealing Alms' drug test results to Begue and claims that, at the time she spoke with Begue, she did not know why Alms had been terminated.   (Doc. 63-6 at 3).[6]

**IV.   Analysis**

    A.   Count I: Negligent and Wanton Conduct by Lexis Nexis

Under Alabama law, "[t]he elements of a negligence claim are a duty, a breach of that duty, causation, and damage."   Armstrong Bus. Servs., Inc. v. AmSouth Bank, 817 So. 2d 665, 679 (Ala. 2001).   Lexis Nexis does not challenge Alms' ability to prove damage, but it maintains that, on the record before the Court, Alms cannot establish any of the other three essential elements of her claim.   (Doc. 65 at 13- 19).

With respect to the existence or non-existence of a duty, Lexis Nexis concedes that no Alabama court has held as a matter of law that an MRO does not owe a duty of care to a third party donor.   (Id. at 13).   In urging this Court to be the first, Lexis Nexis cites Willis v. Roche Biomedical Laboratories, Inc., 61 F.3d 313 (5th Cir. 1995), in which the Court of Appeals made an "Erie 'guess'" that, under Texas law, a drug testing lab owes a specimen donor no duty to use reasonable care in performing tests and reporting results.   Id. at 315-16.   Because Willis' roots are entirely in Texas common law, it is neither persuasive nor particularly helpful here.

However, even assuming without deciding that Lexis Nexis owed Alms the same duty that

---

[6]   Alms testified at her deposition about other statements that Outlaw and other Winn-Dixie employees and vendors allegedly made concerning her termination.   (Doc. 63-1 at 8-17 & 24-25).   However, Alms failed to mention or refer to any of those statements in her complaint.   Accordingly, the Court will not address whether any of those statements were defamatory.   See Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 974-75 (11th Cir. 2008) (affirming district court's refusal to consider claims not alleged in complaint).

it contractually owed Winn-Dixie — namely to determine whether there was a legitimate medical explanation for confirmed positive drug test results (Doc. 67-2 at 7)[7] — Alms' claim fails because Lexis Nexis fully satisfied its obligation to consider Alms' proffered explanations for the presence of codeine in her urine.  Alms reported to Lexis Nexis that the only drugs she had ingested prior to her February 11, 2010 drug test were two semi-synthetic opioids: hydrocodone (Tussionex) and hydromorphone (Dilaudid).  (Doc. 65-17 at 2).  Lexis Nexis considered whether either or both of these substances could explain the result of the confirmatory GC/MS test, which is sufficiently precise to distinguish between different opioids on a molecular level.  Even after Lexis Nexis determined that there was no legitimate medical explanation for Alms' confirmed positive drug test result and reported the same to Winn-Dixie, it reconsidered its conclusion at Winn-Dixie's request.  Lexis Nexis' diligent investigation of alternative explanations for Alms' drug test result forecloses any argument that Lexis Nexis breached its alleged duty of care.

Lexis Nexis' assiduousness is also fatal to Alms' claim of wantonness.  "Wantonness" is statutorily defined as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others."  Ala. Code § 6-11-20(b)(3) (LexisNexis 2005).  The Alabama Supreme Court has clarified that "wantonness involves the conscious doing of some act, or the omission of some duty, under knowledge of existing conditions and while conscious that from the doing of such act or omission of such duty injury will likely or probably result."  Ridgeway v. CSX Transp., Inc., 723 So. 2d 600, 608 (Ala. 1998).  In support of her claim, Alms offers little

---

[7] Alms' complaint alleges that Lexis Nexis "negligently, wantonly, recklessly or willfully failed to determine and/or report whether a legitimate medical explanation could account for the positive results obtained by the laboratory or the 'confirmed positive' result obtained by the medical review service and/or the medical review officer." (Doc. 14-6 at 4).  However, in her opposition brief, Alms attempts to redefine her cause of action by suggesting that Lexis Nexis owed Alms a duty to properly follow its internal operating procedures.  (Doc. 67 at 14-19).  With respect to this new breach-of-procedures claim, the issue has not been joined.  See Doc. 60 (order denying Alms' untimely motion for leave to amend her complaint).

more than a handful of conclusory assertions pertaining to Lexis Nexis' alleged failure to evaluate evidence that would explain her test results,[8] but, as discussed above, the record demonstrates that Lexis Nexis diligently considered every explanation Alms offered.

Lexis Nexis is entitled to judgment in its favor on Alms' negligence and wantonness claim.

B. Counts II and III: Defamation by Lexis Nexis and Winn-Dixie's Vicarious Liability for Defamation by Outlaw

The elements of a cause of action for defamation under Alabama law are "1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement." McCaig v. Talladega Publ'g Co., 544 So. 2d 875, 877 (Ala. 1989). Both Defendants have moved for summary judgment on the defamation claims asserted against them, but Alms has not responded to Defendants' arguments, thereby abandoning her claims. See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). Nonetheless, even if Alms had responded, she would be unable to prevail. Lexis Nexis' report that Alms' drug test was positive for opiates and Outlaw's alleged statement that Alms was terminated because codeine was found in her urine specimen were literally true, and "[t]ruth is an absolute defense to defamation." Foley v. State Farm Fire & Cas. Ins. Co., 491 So. 2d 934, 937 (Ala. 1986).[9]

---

[8] See, e.g., Doc. 67 at 22 ("The non-medical staff acted in conscious disregard of Plaintiff's rights."); id. ("The facts show that Defendant's 'Opiate Policy' was consciously or recklessly violated with the foreseeable result of job termination for Plaintiff.").

[9] The Court need not address the merits of Defendants' alternative arguments that Lexis Nexis' report to Winn-Dixie was privileged (Doc. 65 at 23-24), that Alms cannot prove Outlaw's alleged statement with admissible evidence (Doc. 62 at 11-16), that Alms cannot prove special damages

## V. Conclusion

In accordance with the foregoing, it is **ORDERED** that Defendant Winn-Dixie's Motion for Summary Judgment (Doc. 61) and Defendant Lexis Nexis' Motion for Summary Judgment (Doc. 64) are **GRANTED**.

As provided in Rule 58 of the Federal Rules of Civil Procedure, Judgment shall be entered by separate document.

**DONE** and **ORDERED** this the **1st** day of **March 2012.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

(id. at 22-24), or that Winn-Dixie is not vicariously liable for Outlaw's alleged statement because it was not made within the scope of her employment (id. at 24-26).